Your honors, this is an appeal of a verdict dismissing plaintiff's case in a bench trial before Judge Kugler. No, we're familiar with what the case is about. Let me ask this. I assume that you're not contesting the fact that the sale of the asset purchase agreement that caused the transfer of HTS's assets to ACI. That was an arm's length sale and that ACI did undertake appropriate due diligence before signing off on the asset purchase agreement. Absolutely, Judge. Correct. Okay, okay, okay. Go ahead. All right. So Judge Kugler didn't sit for the underlying case. Dismantled it. We pled three causes of action at trial. Intentional fraud under the Uniform Forging Transfer Act, NJSA 25 colon 2-25A. Constructive fraud under the act, 25 colon 2-25B1. And constructive fraud under NJSA 25 colon 2-27A. It's plaintiff's. Mr. Molinaro. So it's Judge Bibas. So you are not contesting the way Judge Simandl characterized the case on the motion to dismiss in 2012. Your argument is not with the sale of Hollywood Tanning. Your argument is with the June 22nd, 2007 distributions. Correct? That is precisely correct, Your Honor. And that was one of the problems with the district court's analysis, as I think you're arguing. Yeah. Okay. Of the first cause of action, intentional fraud, Gilchinsky, which is the controlling case here, talked about that there's two ways that you can prove intentional fraud. One, when there's an actually stated intent to defraud, which is a very rare circumstance. And secondly, when the court can prove intent through inferential reasoning through the 11 badges of fraud. Well, take us to those badges, because we're familiar with Gilchinsky and Moody and the other cases in this area. Walk us through the badges and tell us why Judge Kugler got some of the badges wrong and causing him to find that your case should be dismissed in its entirety. That's fine, Judge. And I will do that. Can I just briefly speak as to the actual intent? All right. Okay. As to the actual intent, Judge, this is, I believe, one of those rare cases where we actually have proof of an actual intent to defraud. And that comes in an email that was received or submitted between Ralph Veneto and David Rahm, the controller at H. Hollywood Tanning Systems, on May 9th, 2007. Please recall, Your Honors, that the asset purchase agreement was signed in April of 2007, and the closing took place on June 22nd, 2007. And part of this dialogue or this exchange between Mr. Rahm and Mr. Veneto and a landlord by the name of Brendan Rowan went as follows. One of the things that Mr. Rahm was charged to do, he was actually exclusively charged to move the transaction along and do whatever the buyer needed to do that. And one of the things that the buyer wanted to do was have the landlords, the 343 landlords, sign an assignment, an assumption agreement of the lease obligations. Mr. Rowan was reluctant to do that, and he expressed that reluctance to Mr. Rahm. So what Mr. Rahm did is he forwarded the email to Ralph Veneto, the president of HTS, and said, look, he's giving me a hard time, effectively. And in response to that email, Mr. Veneto said, I think you should call him personally, quote, I think you should call him personally and explain it's in his best interest to sign this because there won't be any assets left in HTS, close quote. Your Honors, I believe that that very statement in and of itself, along with the transfer on the date of the closing, proved intentional fraud under the statute. We're in the- Right, so we do have this issue of deference to the fact finder. You need clear and convincing evidence. Our review is very differential. Do you have any case law or argument about this unusual situation where we have Judge Simandl in 2012 with an opinion that's pretty favorable to you, but then we have a different finder of fact, Judge Kugler, at this actual trial. So does that alter the deference that we pay here? Your Honor, perhaps I should have briefed that point. And I think that it does because the whole point of providing deference to the finder of fact or the trial of fact is that the trial of fact is there. He listens to the witnesses. He hears the testimony. He can address and assess credibility, whether it be an expert, whether it be a fact witness, what happened. He's in the trial. He's in the trenches. That didn't happen here. Judge Kugler effectively, Your Honors, was sitting as you are now before me reading a record and nothing else. You might want to put a 28-J letter on that. That might be helpful. Yeah, it would be. Let's talk about the badges of fraud. Back in the 2012 opinion, Judge Simandl wrote that plaintiff agrees that it is not alleged factors B, D, F, G, J, and K. But I think you are disputing B and G now. And I want to ask your opponent about, your adversary about B and G at least. Why should we consider your arguments on those badges if at least at one point you already conceded them? What do you make? Is there an estoppel problem here with our considering them? If at one point you suggested you weren't going to contest them? Well, Your Honor, at that point in time, recall that that was the first amended complaint. We then filed a second amended complaint after we exchanged some discovery and that addressed all of the factors and all of the badges of fraud. So I don't think there was an estoppel argument because facts became aware. By the time that decision came down in 2012, effectively no discovery had taken place. Thank you. Let's talk about badge G perhaps. Your whole brief on badge G basically equates it with badge C in terms of talking about concealment. But the statute talks about concealed or removed. Let's say we find that there's not concealment here, or at least that it's not clear enough to overcome our deference. Should we treat badge G differently? Well, Judge, it was concealed. But let's say we find that it wasn't clearly concealed. Were assets removed? Yes, assets were removed, Your Honor. What happened was the transfers of $23.4 million that were made on the date of the sale never touched Hollywood Tanning's banking accounts. They were four wire transfers in the approximate amount of $5,800,000 apiece that went directly to the Venuto Defendant's personal accounts at Wilmington Trust. So those payments, or that consideration, never came into Hollywood Tanning's systems. It never touched the account. And the argument in our papers were that a creditor wouldn't have seen them, so they were disclosed, not disclosed, because the general ledger is a worksheet of all of the transactions that come into a company through their QuickBooks ledger, and it just simply was not on there. But didn't the Asset Purchase Agreement spell out how that distribution was to be made and that was going to be made as part of, basically, as part of the closing, wasn't it? It did, Your Honor. And it said that the closing proceeds were going to go to the seller, Hollywood Tanning Systems, Inc. And it didn't say anything about the money's going to the principles of that entity. I'm assuming that, I shouldn't assume anything, but the APA is clear. The proceeds were to be received by the entity, not its principles. One thing, I want to get into the whole idea of foreseeability in terms of the insolvency, and I'm not sure that the district court really addressed the issue of foreseeability. It seems to me he focused on whether or not there was insolvency at the time of the closing as opposed to whether or not insolvency was foreseeable. I'm sorry, at the time of the lease, as opposed to whether or not it was foreseeable. But this is a situation where this was, historically, a very, HTS I'm talking about, was historically a very successful enterprise. Only 10 of these stores had ever been permanently closed in the entire history of the company. ACI did their due diligence, which is why I asked you about that being an arm's length sale. They got in there, they looked at the balance sheet. They thought that HTS was going to be a very viable organization and they wouldn't have paid the $40 million that they did pay for it. And when you take out the money for the liabilities. So, but you're arguing that's not where we should be focusing. And I guess you're arguing that's where Judge Kugler erred that we have to focus on what came after the sale and look at the way the Veneto's dealt with the proceeds of that sale to get to the beds and there's fraud. I guess that's what you're arguing. That's correct, Your Honor. It's not after the sale, actually at the time of sale. Because all of the transfers were $26.5 million worth of transfers occurred on June 22nd, 2007, the date of the sale. And for instance, Your Honor, one of the transfers in addition to the $5.8 million in proceeds that went directly to each of the shareholders, one of the transfers was a payoff on a mortgage on a shore home that all of the Veneto family members owned together. And it was for the $1,850,753.85. And the reason why I give that specific number, Your Honor, is in order to pay that off on that very day of closing, they had to have the intention and have had gotten a payoff figure from their bank that they were going to be making this distribution at the time of sale.  The mortgage, Your Honor. Okay, that's it. I didn't know what you were referring to. It was the mortgage? Yes, it was a mortgage on a shore home that they owned together. It must've been a pretty nice one. Okay. Mr. Molinaro, could I ask you about whether Hollywood Tanning had anything left to pay its debts after the distributions? What do we make of the 25% equity interest worth supposedly $10 million? Isn't that a substantial asset? Well, Your Honor, that equity interest, first of all, was determined as follows. The purchase price or the sale price was $40 million. And the Venuto family retained, or actually Hollywood Tanning Systems retained, a 25% interest in the new entity of the buyer. So what they did was effectively they said, well, if they paid us $40 million for the company and we're retaining a 25% interest, and you divide 40 by 25%, that's how you get the valuation, so to speak, of $10 million. Now, one other thing to note is that there was expert testimony on this case. And the defendants hired a CPA by the name of Bill Peterson who did not opine as to the value. So he did not. So this figure of $10 million, quite frankly, Your Honor, I believe, in light of what happened, was a total and complete fiction. Well, but there was due diligence done. And that's why that, to me, seems so important. You've got an objective arm's length buyer who came in and looked at this company. And the way that $10 million was arrived at, they had to believe that there was enough left in the company to justify that. And also the Venutos maintained a 25% interest in the entity that survived. And to what should we make of that, if anything at all, the fact that they were willing to retain a pretty sizable stake, 25%, in an entity that, again, given the history of this enterprise, had been a very successful enterprise and they've been very microscopically involved in the operation of these tanning salons historically. Your Honor, all I can say is that while they did their due diligence, they obviously made a pretty big mistake because this company folded in less than two years after the sale. But one of the- That could have been because ACI did not have any knowledge or any familiarity with tanning salons. And indeed, that's probably what your opponent is arguing, that, and let me ask you this. Was there any evidence at trial to establish as to why the enterprise folded after the closing? There was, Judge, well, not the reasons why. There was an explanation by a member of the buyer. Her name is Maria Mutati, and her certification, or rather her testimony, is not in the transcript. So I'm reluctant to refer to it unless- Well, I appreciate that. I appreciate that. But don't you think that would be relevant that Judge Kugler, well, he didn't hear the evidence. He reviewed the evidence. But are you saying that Kugler was not able to review that testimony as to the reasons that the business did fail once ACI acquired it? No, it was part of the record, Judge. But I don't believe it's part of the appellate record. You can still cite that. But was there any discussion of the fact that the 2008 financial crisis hit that that could have been an unexpected tsunami that would swamp even a solvent good business? Indeed, it did. But irrespective of whether or not the business was good at the time of sale, the business had ongoing obligations. First of all, while they had a 25% interest in Tann Holdings, they couldn't sell that interest without the approval of the majority shareholders, meaning the buyers. They couldn't transfer that obligation. In other words, it had no saleable value. And I think that we addressed that in our briefs as well, that in order for an interest to have value, it has to have an actual saleable figure on the market. And that's exactly what didn't happen here. Not only did they have a 25% interest in Tann Holdings, in all fairness, they also had the ability potentially if they were to reach certain income levels to have like a bonus payment come to them after years one and two. But even with those bonus payments, there was a provision within the Tann Holdings operating agreement that basically said, even if you earn your bonus, so to speak, in years one or two, if in the discretion of the officers of the company, we deem it that we need the cash, we're gonna hand you a note, but we're not gonna pay you your bonus. So on the date of closing, there was $117,000 left in the checking account. Within four months of that closing, the principals of Hollywood Tanning had to put back into this business $1,955,000. They clearly did not leave. There were other obligations. There were insurance obligations, tax obligations. They couldn't sell their interest in Tann Holdings to fund those obligations. They needed that out of capital. And because they took all of the proceeds, they weren't able to fund it. What did the 5 million in escrow go for? Was that just wrapping up closing costs, those kinds of things? It was, Judge. And the way it turned out is that in October, I believe it's October 17th, 2017, when they did the, 2007, forgive me, when they did their true up, there was a shortfall of $6.3 million. So when they did their true up in October and the defendants agreed to that number, they were at $1.3 million short. And as the record reveals, in order to fund that rather $1.3 million shortfall, each of the principals in October had to kick in $370,000 a piece just so that they could pay what was owed to the buyer. And you talk about a little bit about constructive fraud. How can we tell if a transfer is unreasonably small? It doesn't need to be, if the amount left is unreasonable, if the assets left were unreasonably small, it don't have to be insolvent, but still what's the record evidence here that it was unreasonably small? The record evidence, Your Honor, is that on the date of closing, there were two transactions that occurred. $4.4 million of the closing proceeds, which were left over after each of the principals received 5.8 million each, came into a new account called an investment account that Hollywood Tans had opened to consolidate all the cash from other bank accounts that they had so they can manage everything in one account. When that $4.4 million was deposited into that account and $127,000 that was obtained from other open bank accounts were all deposited, by the end of that day, not only did they spend the entire amount of the closing proceeds, but they attacked another $10,000 of money that was in place before the transaction occurred. Who thought there was a balance of $117,000 in the investment account at the time of the transaction? There was, Judge, but before that happened, they had transferred in $127,000. So in essence, what they did is they spent all of the closing proceeds and then out of the 127 that they had from other accounts, they took another 10,000 out of that and that's where we got the 117 at the end of the day. Your time's been up for a bit, unless either of my colleagues have any questions, we'll hear from your colleague. You have some time on rebuttal. Okay, Mr.- I'm sorry, Your Honor, I didn't hear that last thing that you said. Yeah, I said you had saved some time for rebuttal, but your time's been up for a bit. That you go over is normally our practice, but unless my colleagues have any questions, we'll hear from Mr. Corporello, I hope I'm pronouncing that correctly. Carapello, Your Honor. Corporello, thank you. Carapello, can you hear me okay? I can hear you just fine, yep. Okay, why don't you go ahead then. Thank you. I'm gonna just start by responding to what was raised between the panel and appellant's counsel. The first thing that was raised was the, what was the focus here of the case? Was it the shareholder distributions or was it the asset purchase agreement? Judge Kugler did focus on the shareholder distributions that was the transfer that was potentially avoidable. That is what is referenced everywhere in his opinion. That is what's referenced in the prior opinions of Simandl. Of course, they had to, both Simandl and Kugler had to talk about the asset purchase agreement since it was an integral part of the transaction and part of the alleged solvency or insolvency of Hollywood tanning systems. With respect to the giving deference to Judge Kugler, of course, the court should, Judge Kugler was the trial judge. He did schedule a rule 63 conference and he held- There's really no trial. And I've written a little bit about this, but I understand what the law is. But in reality, I think anybody who's been a trial lawyer or a trial judge knows that although we talk about the deference owed and the reason we owe deference to the person who's there to see the witnesses, in reality, I can't really tell if someone's telling the truth or not, the more practice they are lying, the better the witness becomes. But put all that aside. Here, Judge Kugler did what we're doing. He looked at the transcript. So the question that was raised earlier is a good one. And I would invite you also to follow 28J reply to that. Is this a situation where any deference, even given the reasons for, in our policy of giving deference to the trier of fact, he wasn't really a trier of fact here. He was a reviewer of transcript and he made certain conclusions based upon what he read. He read the same thing we're gonna read. Of course, but that is the law, Your Honor, as you said. Yeah, but it arises in the context of assuming that the person who's the trier of fact sees the evidence as it comes in, can evaluate the witnesses as they testify. When that goes away, I'm not sure the reason should persist. Well, the way Rule 63 works is, Federal Civil Procedure 63, if a judge becomes incapacitated or passes away and another judge takes over at the district court level, that judge schedules a conference and invites counsel to that conference to discuss whether counsel wants to recall witnesses or whether the court wants the successor judge, in this case, Kugler would want to recall witnesses. That conference was held on August 19th, 2019. There's a transcript. I ordered the transcript. It's now on the docket. Judge Kugler invited both Attorney Molinaro and I to recall witnesses. We both declined. Judge Kluger said he did not believe it was necessary to recall the witnesses. He was familiar with the record. And then he proceeded to make a decision. And once a judge proceeds under Rule 63, the appellate court, you, Your Honor, must give deference to that. It's not a soft standard. Mr. Catepelle, you, of course, are free to argue that in the 28J letter, and I'd like to see the authorities, but there's something particularly odd here because some of the things Judge Simandl said in his 2012 opinion denying the motion to dismiss, et cetera, is at least in tension with the findings that Judge Kugler made. And so I, too, am interested to learn, is this a hard and fast rule, or do other circuits or our court apply a little bit of a siding scale or defer to the extent that it's warranted? But I don't understand whether deference means exactly the same thing in this context. And the case, Your Honor, is Second Circuit Atlantic Specialty Insurance Company versus Coastal Environmental Group, 945 Fed 3D 58, year 2019. And that court held that under Federal Civil Procedure 52A6, factual findings of successor judges who have certified their familiarity with the record are subject to the clearly erroneous standard of review. It went on to say, successor judge has no independent obligation to recall witnesses unless requested by one of the parties. The deference is the same that would be due if the findings had been made at the district court judge who presided over the evidence, even when the successor judge relies on a documentary record. All right, it'll be good to see, you can discuss the Atlantic Specialty in your letter, and I think it'll be helpful to see Mr. Molinaro's response to that as well. Perhaps we could move to this. You started with the point that usually we do the badges of fraud, but this might be an unusual situation where we have this actual intent. I'd like to hear you discuss the Ralph Venuto email of May 9th, 2007. Why do you think that doesn't show actual intent to defraud? Because he testified elsewhere in the transcript in right after, in the context of where Attorney Molinaro cites, that they were, the point to that email was just to indicate that Hollywood Tannings was selling all of its assets, and it was an asset sale. It wasn't for the meaning that Attorney Molinaro has assigned on appeal. And there were many other points in the record where Mr. Venuto testified that this was an arm's length transaction, and it was, there was no intent anywhere to bankrupt Hollywood Tannings or make it a shell company as they allege, and that's why it was not considered by Judge Kluger. Well, it was considered, but it was found not credible or disregarded by the two of the other testimony. Had Kluger been able to call Venuto in and ask him about that May 9th, 2007 email, I mean, that would have been a very helpful inquiry, which was neither here nor there. It didn't happen, and we have the record as it is, but that seemed to me, that would have been a line of questioning that probably the judge, I certainly would have wanted to have that discussion with Mr. Venuto. What did you mean by this? And then go from there, because your interpretation is certainly a valid one, but Mr. Monoro's argument about what that language means is also a valid one, and you're right. We have findings of fact. There's an issue about how we treat those findings of fact now, and I understand your position on that, but that, I'm sorry, we don't have an inquiry of Venuto about that email. Well, they had an opportunity to recall the witness in the way Federal Rule of Civil Procedure 63 works, that if they don't recall the witness, then the issue is waived. In other words, they can't have it both ways. They cannot attend a Rule 63 conference and decide not to recall any witnesses, get a decision, and then if the decision is against them and they lose, then they say, oh, well, you know what? We really want a witness, or we should have recalled a witness, or we'd like the appellate court to adopt a softer review, not a clearly erroneous, but something else. That's the whole point to Rule 63. I understand that, but it seems to me from Mr. Molinaro's position, why would he want to call a witness when he's got this explicit language in an email? It can only get worse from there. Why get him on the witness stand and give him a chance to explain? Because he did explain. There was an explanation in the transcript for Mr. Venuto that there was never, this email doesn't, it doesn't say what Attorney Molinaro is arguing. It was just an email that Ralph Venuto sent to somebody to say, we are selling our assets, and so here's what we're doing. We're trying to buy out the leases and pay off the leases and get everybody current. Mr. Carapello, I think it would be helpful, unless my colleagues want to stay on this point, it would help me to march through at least seven of the 11 factors. I have to confess, I found the decision below less than crystal clear about many of them, both what it was explicitly finding and based on what. So I'd like to hear you talk about them. I think there are four of them that no one is really disputing right now, but let's start with A, whether the transfer or obligation was to an insider. Now, MSKP says the transfers were focusing on June 22nd, 2007, the day it closed. Not the sale, but the transfers afterwards. The ledger shows each of the Venutos got 5.86 million. They were shareholders, they were officers. Is there any dispute that those transfers were to insiders who were defined as an officer or a person in control? They were transfers to an insider. All right, so you concede badge A is present. Yes. All right, let's go on to badge B. Badge B is, did the debtor retain possession or control of the transferred funds? Now, the relationship between the Venutos and Hollywood Tanning was very fluid. It's not clear that they're really respecting the corporate form rigidly here. Why shouldn't we find that Hollywood Tanning retained possession or control of the transferred funds? They did not retain possession or control of the distributed funds because once the distributions were made, that was it. They weren't kept in a bank account. They were put in a personal bank account belonging to each. Each Venuto family member received the same amount of money. And so that was it. And it wasn't, and that was it, Your Honor. Okay, so because the corporate form was respected enough that we should treat that transfer as conclusive. They were. And in fact, they would have had to been because Hollywood Tans was also taking a 25% interest in this new entity, Tan Holdings. And Tan Holdings didn't wanna pay all this money to Hollywood Tannings if Hollywood Tannings was simply gonna keep the money that Tan Holdings was paying it and put it as part of a 25% interest. That would have made no practical sense. Okay, I get that. Okay. How about badge C? Was the transfer concealed? Now, I don't see the shareholder distributions on Hollywood Tannings general ledger. Now you respond, well, it showed up somewhere in the tax return. We only have the first page, so I can't really confirm that. But how were creditors like MSKP supposed to find out about the transfers if that's the focus on, the reason we focus on concealment? Well, the transfer was not concealed because it was a proper distribution made. They historically, Hollywood Tanning systems historically made distributions to shareholders. And it was shown at trial that this whole issue of the general ledger was just nonsense. The general ledger gets converted into a trial balance and it appears in the trial balance and it appears in the tax return at the end of the year as a distribution as it would have to when they filed their taxes for 2007. So it wasn't concealed from the world. How were they going to find out about the distributions? They were aware of the sale. All right. I don't think there's a dispute about D. I don't think anyone's disputing that there was a debtor who was sued or threatened with suit. So I think we can skip that. How about E, the transfer was substantially all of the debtors assets. I think your dispute on that point is Hollywood Tanning maintained substantial assets because of the 25% equity interest. But there's a lot of reasons to think it wasn't liquid. It was closely held. They need to get approval to sell as Mr. Molinaro argued. So if we set the equity aside and a grant, that's an if and you dispute that. If we set the equity aside, were there any other assets Hollywood Tanning had left that would defeat that substantially all of the debtors assets? Yes, they had accounts receivable and they had monies that were owed by, I guess, former store owners, franchisees, and they had other assets as were identified in the case. What was the total of those? Yeah, give us quantify like how much the account receivables were, how much they were creditors on these debts owed. The accounts receivable, that's the good question about the accounts receivable. It was, I believe it was in the seven figure range, meaning more than a million dollars. All right, and how about the debts that were owed by these others? All the accounts receivable and the debts owed by former store owners would have exceeded that. They had the money in the investment accounts that were your honor mentioned as $117,000. And they had the 25% interest and the right to earn profit distributions. Okay, I'll be interested to hear what Mr. Molinaro wants to say about that and the concealment point maybe on rebuttal. I don't think anyone is arguing about F that the debtor absconded. How about G? On G, your briefing and Mr. Molinaro's briefing is all about the concealed point as if G is redundant to C. But the statute says concealed, removed, concealed or removed, removed or concealed assets. Didn't Hollywood Tanning remove enormous amounts of assets through the shareholder distributions? They went directly to the shareholders. So only in the most technical sense were they not removed. Those assets were no longer available to creditors. Why isn't G satisfied? You're talking about- The distribution. The distribution from Hollywood Tannings to- The individual shareholders. Right. Yeah, exactly. When I look at the statute, none of you is talking about this removed alternative, but the statute says that can suffice for badge G. Well, as Judge Kugler found, the amount owed to the landlord, MSKP, was not related in any way to the distribution by- Judge Kugler focused on concealed. No one is talking about the removed prong here. There's no discussion of this in Judge Kugler's opinion. It wasn't an asset that was removed. It was an asset that would be removed as if, let's say I had, you know, $1 million in a bank account and a creditor had a judgment against me. I just removed it and put it somewhere else. This wasn't a removal. This was a shareholder distribution. What if you distributed the amount in your bank account to your wife and she took it and put it in an account that was solely in her name? Would that be a removal? Right, because that's an extra, that's a non-ordinary business transaction. That's something that this intentional fraudulent transfer statute was meant to protect. But if you're right about that, then you're saying if you schedule the distributions in such a way as they fall within the normal course of distributions of the company, then you evade scrutiny under G because you argue, but this is just something done in the normal course of business. Even if the purpose of the distribution was to put at risk the interests of future creditors. That's right. You're now making Kugler's case, Your Honor, is that if the asset purchase agreement was bogus, yes, then declaring a shareholder distribution would have been bogus too. But you had an arm's length transaction. And so the distributions that flow from it are arm's length and they're not part of this removal or concealment. I don't get, I don't understand that follows because let's take ACI out of it. I mean, that's where the arm's length transaction comes in. The dealing between HTI holding, I'm sorry, HTS and the Venuto's, those are not arm's length. The HTS are the Venuto's in their corporate business form. That's not arm's length. And I think that's what Mr. Molinaro is skeptical of. It's a, right. Well, the example you mentioned is not comparable because you're talking about a husband and wife. The classic fraudulent transfer is the husband gets hit with a million dollar judgment. He has a million dollars in his bank account. He's on the bank account only. He wants to evade that from a creditor. So he comes home from work one day and says to his wife, hey, honey, can I put this million dollars in your bank account? Yeah, that's concealment, that's removal because that's not ordinary transaction between the husband and wife. This was an ordinary transaction between TAN Holdings and Hollywood TANs. It was an ordinary shareholder distribution. There was testimony at the trial, plenty of it that they made distributions for years this way. And so it was consistent with prior practice. And so if this was a concealment or removal, then all these other prior distributions could potentially be for Hollywood TANs. They could be for any other corporation. And the purpose to this intentional fraudulent transfer is to prevent a debtor from removing his property from the jaws of execution. And that's just not what happened here. You know, I don't see any findings in, this is page, appendix 29, page 27, paragraph eight. Because Judge Kugler thought the test was just concealed, I don't see any findings that discussed this. So it would seem like if we think this is pivotal, that we would at a minimum need to remand. I'm sorry, can you say that again? You were saying, this is what Judge Kugler thought about this. I don't see it in his opinion, in his conclusions of law, when he's making the findings on this badge. So I don't see how we can defer to that. It's everywhere else in the record, Your Honor. All of the findings of fact, indicate or support what I'm telling you today at this oral argument. Judge Kugler did make- I think he got the law, at least it is not clear to me that the law is correctly spelled out on this badge. So I can't know that there's something to defer to about applying it. Maybe he understood it correctly, maybe he didn't, but I don't see it on when it comes to analyzing this badge. So I'm not quite sure what we're deferring to here. You're deferring to a finding of fact that was abundantly clear as I just presented to the panel, and that the conclusion of law is a result of that finding of fact. I mean, he didn't get the law wrong. He didn't state the law wrong. He didn't- He said nothing about removal, which is one of the two prongs of this badge. I'm looking where he's discussing making the conclusion of law on the badge at page 27, paragraph eight, and there's no finding that nothing was removed. There were all of the findings of fact, Your Honor, referenced the distributions. And there was nothing removed. There was no way, I mean, if there was nothing removed, he's not going to make a finding. He's not gonna disprove a negative. He's just going to make a finding of fact, and then the conclusion follows. All right, I'm not gonna beat a dead horse here. Let's go on to badge eight. Yeah. Was the value of consideration reasonably equivalent to the value of the assets transferred? And that's also gonna be important when they get to constructive fraud. What did Hollywood Tinning get in return for the shareholder distributions? We did not- To make it reasonably equivalent value. We did not, we did not, I don't believe we argued that case post-trial. That particular- Are you conceding that one? Are you disputing they didn't get reasonably equivalent value? Which one is that? G, I believe. H, it's H. H. Let's see. Your point is arguing that your clients took $23,400,000 for themselves with no asset in return going back to HTS. Do you have any basis to dispute that? No, I'm not, we didn't dispute that. You concede H then. All right, let's go on to I. If the debtor was insolvent or became insolvent shortly after the transfer. A debtor's insolvent if the sum of the debts is greater than all the debtor's assets. After the shareholder distribution, you mentioned the assets they had left to pay debts was like, at least the liquid assets was about a million dollars, accounts receivable and creditor. Was that enough to pay, to be able to pay their debts? Yes, and they put on expert witness testimony. An expert testified for hours and hours and produced a voluminous report of, I don't know, 200 pages plus exhibits. And they tried to prove insolvency and weren't able to. Our expert, your honor, was a rebuttal expert who rebutted their testimony. Their expert was found to be not credible by Kugler as he did not rely on the report. And that's because the expert did not testify credibly. The expert did not state her opinions with confidence under cross-examination and was not credible. All right. Didn't the district court focus on whether or not the franchisee was able, HTS's franchisee, was able to continue to pay its debts after the transfer as opposed to whether or not HTS was? Did the district court, you mean, did Simandl or Kugler? Simandl, I'm sorry. The way I read his opinion is somewhat ambiguous because he talks about 2008 or 2009 and that the franchisee, it looks like he's saying the franchisee was able to continue paying its obligation. Yes. Is that the inquiry? Or should it be that HTS is able to continue to pay it? Well, in this case, I believe the tenant was paying, you know, the individual store owner was paying the rent directly to the landlord and had been and just continued. And I suppose at some point that stopped. You know, Judge Simandl requested information, as you know, about when the rent payment stops and there was no evidence in the transcript to indicate when exactly it stopped. But it was current as of the time of the sale or the rent was current. Right. So let's try to sum this up. My understanding of the New Jersey case law, and you can correct me if you disagree, is that we don't focus on the fact that a few are absent. We focus on whether badges are present. And if there are several badges present, you know, that can easily suffice. You've conceded badge A is present, transfer to insiders. You've conceded badge H is present, they're not getting a reasonably equivalent value for all the money that's being taken out. You're disputing G, but I think they've got a strong case on G that the debtor removed the assets. Maybe you've got some case law that will make us read the verb remove differently. But if there are two or three badges of fraud clearly present, and then a few more that are being disputed like concealment or insolvency, if that at least directs a presumption of fraud, what evidence would you point to that would rebut that presumption? Well, the badge of fraud relating insider, I believe was present from the start of the case. So, you know, and judge what... And so the only other one you mentioned was the reasonably equivalent value. So that's two, and then there are several others where... And the way the law works is what, you don't look at what badges are missing. You do look at what badges are present. It's kind of an affirmative look, not, you know. But you're doing that with the eye to whether that would show that there was a fraudulent transaction. Okay. You know, and there was mountains of evidence presented that this wasn't a fraudulent transaction. This wasn't a husband just giving his money to his wife. These were shareholder distributions made following a legitimate arm's length sale by a solving company, which the panel noted had had a very positive success. The sales legitimate, no question, but then the family goes and drains everything out of the company. What's the mountains of evidence that show that not just taking some of it out, but taking most of the money out at that point that rebutts the idea that this is just, you know, leaving a shell corporation, especially when we have this Ralph Venuto email that is pretty suggestive that they knew they weren't leaving very much in there for these, you know, landlords or others to go after. Because they took a 25% interest in Tann Holdings. They were confident, and that's why they took a 25% interest in Tann Holdings. They didn't abscond. They wanted Tann Holdings to do well. They wanted Tann Holdings to pay the leases. What's the best evidence in the record you want to cite to us? Ralph Venuto's testimony that he believed Tann Holdings would be very successful. And that's in the transcript of Ralph Venuto. And I believe it's somewhere in Judge Kugler's, I don't know for sure, but I believe it's in his opinion. Well, he cites to the history of success of the company. As I said, it's a very successful company historically. Right, and that's why they were able to make distributions historically and continued when the sale happened and took the 25% interest. That would have, that was- When you're getting that much money upfront, and initially I was kind of, didn't know how to interpret the 25% interest. But the more I thought about it, it seems to me the less significant it becomes. If they're getting that much upfront, the fact they take 25% of what they may in the future understand is going to be nothing because they're denuding the company. Well, so what? Because they're walking away with over $5 million a piece. So they're getting 25% of nothing in the long run. That's fine. Give me that deal any day. Give me 5 million now and 25% of nothing. I'm happy with that. I don't need this 25% of nothing. I've got my 5 million. So I'm not sure that what the 25% interest accomplishes in terms of negating an intention to defraud there. The pockets were already lined. If they couldn't line them further because there's nothing to get 25% from, all right, well, would have been nice had they been able to get 25% or something, but they didn't. Well, I think, again, that's kind of trying to prove a negative. I mean, Rafferuto testified that he wanted to be part of the Tann Holdings success. He never testified that he was just looking to cash out. Well, I wouldn't expect him to. This is a very bright businessman. I wouldn't expect him to say that. Your Honor, that's what their expert witness tried to do. I mean, that's what their expert witness devoted many, many pages and hours of testimony to is that it was a fraudulent transaction and they did know that they were getting or that their 25% was worthless. That's already been vetted, Your Honor, at trial in many instances, many. And that's what also rebutts this email from Ralph Fanuto. I mean, they had an expert witness. Their case regarding solvency was predicated largely on their expert witness who produced a valuation report which said many things. And what it did is it tried to reconstruct the Hollywood Tanns financials as of June 22nd, 2007. To say that they weren't liquid. They weren't able to make these distributions. They were actually losing money and they knew what they were doing and they knew that they were selling a company that was worthless and that their 10% or, I'm sorry, 25% stake would be worthless. All that already has been processed, vetted, considered, reviewed, decided. And that's why the appellant cherry picking one email from Ralph Fanuto just doesn't cut it on appeal because there's just a mountain of other evidence that was considered by Judge Kugler and that was heard by Judge Demandle, which is under Rule 63, one in the same at this point. Okay, thank you very much. Unless one of my colleagues have any questions, we also let you go over a bit, which I think is fine in fairness to you with that, Mr. Molinaro. I do have a bankruptcy court hearing at 1130, that's all. Oh, what time is it now? 10 of 11. Okay, all right, okay. I'm happy to stay. Okay, well, okay. We can get you out of here by then, I think. If my dear friend, former friend, Judge Becker was presiding, I'd have to say, well, there's no way in the world you're gonna get out of here by 1130, but we can get you out of here before then. Okay, Mr. Molinaro, you had five minutes, I believe. You're muted, sir. You're muted. Yes, I'm sorry. Your honors, the mountain of evidence that Mr. Caracullo recites to win the record how Ralph Vaduto explained this email of May 9th, 2007, frankly, your honor, I don't have any recollection of it, and I would have thought the counsel with such a damning point would have addressed this in our brief. This is not in my argument alone. It's in our moving papers that we believe we proved intentional fraud by virtue of this email. There was no reference to this mountain of evidence about how he explained what he was saying. With that having been said, Judge, let's turn back to the badges. One of the badges that Judge Bibas was concerned with was the removal. And Mr. Caracullo said that, well, there wasn't really a removal, that all of the assets were transferred to the shareholders, and this is a process that they undertook in the past. Well, one of the things Mr. Caracullo does not explain to the court is that those $5.8 million transfers that were made to the Wilmington Trust account were not only made to the shareholders, but it was made to their wives. The record, the appendix has copies of the deposit, or rather the monthly statements, which reflect that Ralph Venuto Jr.'s wife was on that account, Richard Venuto's wife was on that account, and his sister Carol Rebecca's husband was on that account. So these transfers, when you're talking about removal, they were not only placed into the accounts or into the pockets of the shareholders. With regard to insolvency, there are several different types of insolvency. There is balance sheet insolvency, and there is equitable insolvency. And I think that we're dealing with equitable insolvency here because the court only needs to look at the checking account and the deposits that were made immediately following this transaction. They had a $90,000 insurance policy that they had to pay. They had to pay a true up to the buyer after six months. They had to pay state taxes, federal taxes, and they left $117,000 in the account. They didn't have enough money to pay. That's the investment account you're talking about now. The investment account. Well, that was the only account, Judge. That was all that was left of the cash of this company. Let me ask you this, Mr. Bonner. I think you'd agree that under the New Jersey fraud scheme, under any fraud scheme, we're not talking about negligence. We can argue that at a certain case, I'm not saying this is the case. One could argue that the facts could be spelled out in a given case where the negligence becomes so overwhelming that it's pretty suggestive of a fraudulent intent. Forget that for a second. Let's just assume that we're talking pure negligent forecasting in terms of how a business is going to succeed. I think you'd agree that the New Jersey fraud statute does not reach someone who is just a bad forecaster of what's going to happen after they get rid of their business. Here, there's a franchisee in place. Why wouldn't it be the case that the Venuto is even, this fits in with the May 9, 2007 email. Ralph Senior could have thought, well, you know, I've built this business for my family. We're going to cash out. This will make sure that my family, my wife, my kids are secure. I don't have to worry about creditors getting stiff because there's a franchisee in place. My company has a history of not selling a franchise to anyone unless we're pretty certain that person knows what they're doing and they're going to be successful franchisees. And historically, almost none of my franchisees have failed. So I'm going to just take what I can for my family and run. And the leases are going to get paid because there's a perfectly solid tenant in place to pay the lease. Seven, eight months later, we find out there's not a solid tenant in place, or at least the lease didn't get paid. And we don't know quite when that went into default, I guess. But what would be wrong with that? Just looking at this is just a really bad guess as to what's going to happen after the asset purchase agreement is closed. Because, Judge, that is what the Fraudulent Transfer Act is protecting, and was enacted to protect. Well, only if the badges rise to the level of fraud. And I said at the very beginning, you could have such negligence as to be suggested of a fraud. But what if it's just bad forecasting? You didn't mean to stiff anybody. You just meant to build a nice little nest egg for your family. You were wrong. That goes to the specific intent, whether or not we've proven specific intent to defraud. But the badges are constructed because you can't tell a person's subjective intent as to what they intended to do. And, yeah, maybe you can argue that they were negligent. But I think that the overall record here points to something completely different. Okay. And besides the email from Ralph Venuto, there is yet another damaging admission that is in this case that refutes their entire theory here. And that is two years after this transaction occurred, Hollywood Tanning Systems was sued by the buyer under all kinds of fraud theories, breach of contract, what have you. And in their counterclaim that they filed in that case, they stated that Hollywood Tanning System and all of the subsidiaries were shell companies that were undercapitalized from the start. So this $10 million, quote, unquote, equity or interest that they had in this new enterprise, they're saying in a piece of litigation- Well, that's kind of your estoppel argument, though. Isn't that right? That was rejected by the district court? It wasn't even addressed, Your Honor. The estoppel claim, I thought, was flat out rejected because of the whole issue of vertical estoppel. Am I wrong about that? Judge, it wasn't even touched in the opinion. Oh, okay. In Kugler's opinion or Smandel's opinion? I thought Smandel rejected it. It wasn't in Judge Smandel or Judge Kugler's opinion, no. It was not. And first of all, because by the time, when Smandel wrote his opinion in 2012, we didn't even have that evidence before us. We hadn't even exchanged any discovery. That was learned much later. Plaintiff has proven intentional fraud with a specific intent to defraud. We've proven the, we've proven fraud based upon the badges of fraud. We've proven constructive fraud under 25-2-25 and NJSA 25-2-27. Clearly here, what happened was these people had every intention of taking these monies, all of the monies from the sale, all of the monies that they probably would ever see and distribute it to themselves. What could have stopped them when you're talking about the negligence or maybe they were just being negligent? Leaving, taking $5 million a piece and leaving each of them leaving $800,000 of the proceeds check so that they could fund operations that and to fund receivables that were gonna be coming to them. They didn't do that. They wanted to take all of this money out of the hands of any creditor that could come along and say, you owe us. Okay, you're saying, so even if we look at this too, does the negligence quantitatively add up to suggestion for evidence of fraud in that fraud absolutely has to be established by clear and convincing evidence, not just a preponderance of the evidence. You're saying you get over that threshold even looking at it through a lens of clear and convincing evidence. Absolutely, Your Honor. I mean, if you look at the totality of what happened here, it doesn't, and not only does it not pass the smell test, it smells pretty bad. I mean, it was- Well, that would be failing the smell test. Okay, okay, anything else, Mr. Monaro? Nothing, Your Honor. Okay- I'm sorry, one final- Go ahead, Judge. When Judge Kubler was talking about the, oh, the account wasn't in arrears at the time of the transfer. There's no evidence in the record to find out when the tenant went into arrears so that there was quote, unquote, no debt. Judge Kubler, respectfully, absolutely ignored the statute which talks about what is a claim and what is debt. Debt can be liquidated, unliquidated, contingent. He absolutely ignored the statute as it relates to whether or not there was debt at the time, whether it was a claim and whether we had a creditor for purposes of the Uniform Formal Transfer Act. It's a little strong to say ignored. Perhaps he overlooked it. Thank you, perhaps he overlooked it. Okay, thank you, both of you, constable, for a very excellent argument and for your patience in being willing to work with us in terms of getting this case scheduled here today. I do wanna note, this case may have already gone through our mediator, but our mediator, Mr. Taragusa, has been listening in, I'm pretty sure, at our invitation to the argument. And it may be worth, only if you and your clients are willing to engage once again with him and with that process to see whether or not it's not possible to resolve this case via mediation. If you can make that representation, or maybe you can't, do you know whether or not you'd be willing to do that? Well, let me strike that question because we don't need to know that one side's willing to and one side is not willing to. Why don't you confer with Mr. Taragusa and just send a joint letter to us within, I guess, 10 days of today, just letting us know whether or not you're willing to or not willing to. And that should be joint. Don't let us know who's yes, who's no. We just wanna get some ideas to, should we just go ahead and start deciding the case or should we just hold off and let you folks work something out amicably, if you will. And also I'd like to ask that a transcript be produced of the argument, and that can be split between the two of you. And if you have questions on that, Patrick can help you out in terms of the mechanics for having a transcript produced. If we do have to go ahead and decide this because mediation fails, it'd be very helpful to get that transcript, especially given the numbers that are flying around here. I had them relatively straight in my head and a very wonderful memo from my law clerk, but I was never good at math. To this day, I think I'm the reason Mrs. Casey, my 80-year-old math teacher, finally succumbed and died of a heart attack. She just gave up. I was trying to teach Teddy math, she gave up. So it'd be helpful to get those numbers in a transcript.